UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GILLIAN F.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cv-30124-CLM |
| | ) | |
| FRANK J. BISIGNANO, Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER REVERSING COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 11 & 15)

MORGAN, U.S.M.J.

Gillian F. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner denying in part her applications for Social Security Disability Insurance benefits ("disability benefits"), Supplemental Security Income ("SSI"), and Medicare Qualified Government Employment ("Medicare") benefits. Plaintiff contends that the Administrative Law Judge's ("ALJ") decision to deny her disability benefits claim, premised on his finding that she was not disabled between her alleged onset date and her date last

[1] In the interest of privacy, this Memorandum and Order uses only the first name and first initial of the last name of the non-governmental party in this case. *See S.R. v. Soc. Sec. Admin.*, Civil No. 24-12335-LTS, 2025 WL 815122, at *2 (D. Mass. Mar. 6, 2025) ("Use of [the] initial[ ] protects the claimant's privacy while still ensuring public access to the [c]ourt's reasoning and decision.").

insured, was not supported by substantial evidence. Before the court are Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 11) and the Commissioner's motion for an order affirming the decision (Dkt. No. 15). The parties have consented to this court's jurisdiction (Dkt. No. 7). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court DENIES the Commissioner's motion to affirm (Dkt. No. 15), GRANTS Plaintiff's motion to reverse (Dkt. No. 11), vacates the ALJ's decision, and remands the matter for further administrative proceedings consistent with this opinion.

## I. RELEVANT FACTUAL BACKGROUND

On or about September 19, 2022, Plaintiff applied for both disability benefits and SSI, alleging disability beginning June 30, 2017 (A.R. 17, 260-63).[2] Her claims were denied on initial review on October 13, 2023 (A.R. 94-98, 100-07, 136-38, 140-42), and upon reconsideration on February 26, 2024 (A.R. 110-17, 118-23, 125-28, 130-33). On April 25, 2024, Plaintiff requested a hearing before an ALJ (A.R. 148-49), which occurred on February 21, 2025 (A.R. 43-92). The ALJ issued a decision on March 10, 2025, granting in part and denying in part Plaintiff's claims (A.R. 14-42). Pertinent to this appeal, the ALJ found that Plaintiff first became disabled under the Social Security Act on July 4, 2020, and was thus not entitled to disability benefits, for which she was only insured through December 31, 2018 (*id.*). Plaintiff requested Appeals Council review of the ALJ decision on May 9, 2025 (A.R. 249-51),

[2] All citations to "A.R." refer to the administrative record, which appears at docket number eight of this case. The page numbers were assigned by the Social Security Administration and appear in the lower righthand corner of each page.

which was rejected on May 16, 2025 (A.R. 1-4), rendering the ALJ decision final for purposes of judicial review under 42 U.S.C. § 405(g).

A. Medical Records[3]

1. *Treatment Notes Before the Alleged Onset Date of June 30, 2017*

Plaintiff experienced back pain for several years before filing for disability benefits (A.R. 1250). This back pain originated from several injuries at work while restraining students as a school behavior analyst, the first of which occurred in the spring of 2015 and put her out of work for two to three weeks (A.R. 56, 60, 1250). The back pain improved with physical therapy but never fully resolved (A.R. 1250). Plaintiff was put out of work again in December 2016 when a student reinjured her back by pulling her to the ground, "at which point her symptoms shifted from the right side to the left side and started to go down the leg and into the groin" (A.R. 60, 826, 1250). The day after her injury, her primary care provider, Christine Normandin, N.P., prescribed Plaintiff a muscle relaxant and recommended physical therapy, stretches, and "leave from work to focus on rest[,] . . . healing," and physical therapy (A.R. 826). N.P. Normandin renewed her recommendation for

[3] In addition to her back injury and other physical pain conditions (fibromyalgia, headache syndrome, thoracic outlet syndrome, neck pain, and myofascial pain), Plaintiff also claimed that she suffered severe impairments from gastroesophageal reflux disease ("GERD") and generalized anxiety disorder. Because Plaintiff only challenges the ALJ's evaluation of her residual functional capacity as it relates to her physical pain impairments, the court limits its discussion of the evidence accordingly.

Plaintiff to stay on leave from work on January 3, 2017, due to Plaintiff's ongoing symptoms and vulnerability to reinjury (A.R. 823).

Plaintiff began seeing spine specialist Richard Norris, M.D., on January 17, 2017 (A.R. 60, 1250-52). At her first appointment, Plaintiff reported her pain was continuous, radiating, and throbbing and stabbing in quality, ranging in severity from a four to an eight on a scale of ten, was "aggravated by lifting, bending, sitting, or lying down for too long," and was "eased with walking and anti-inflammatory medications" (A.R. 1250). Dr. Norris reviewed x-rays and MRIs of Plaintiff's spine taken in 2015, which showed facet arthritis in the lower lumbar spine, minor arthritic changes at L4-5, and minimal arthritic changes at L5-S1 (*id.*). Examination of Plaintiff revealed a restricted range of motion of the lumbar spine, marked tenderness to palpation over the bilateral sacroiliac ("SI") joints, moderate sciatic notch tenderness, and some tenderness to firm palpation at the lumbosacral junction (A.R. 1251). SI stress test (Gaenslen, Patricks, and Fortin Finger Test) results were "[m]arkedly positive," and Plaintiff experienced pain upon bilateral seated straight leg raise, as well (*id.*). Plaintiff displayed no weakness on manual muscle testing proximally or distally and her sensation was intact in both legs (*id.*). Dr. Norris had Plaintiff stand on her right leg and lift her left leg while he pressed down on her shoulders, which caused pain in Plaintiff's back, buttock, and posterior thigh (*id.*). He then applied the SI support belt and repeated this exercise, and the pain was nearly "completely abolished" (*id.*). From this result, Dr. Norris reasoned that SI joint instability was causing Plaintiff's symptoms (*id.*). Dr. Norris diagnosed

Plaintiff with SI joint issues and recommended activity modification and mindfulness, using an SI brace, and receiving SI injections (A.R. 1251-52). Plaintiff "wanted a chance to try [the brace] before proceeding with SI injections but she did not object to the injections if that would be necessary" (A.R. 1252).

Plaintiff returned for a follow-up appointment on January 30, 2017, at which she reported her pain was about the same, ranging from a three to an eight on a scale of ten, was "continuous in the back and intermittent[ly] radiating . . . into the right groin and leg," and was still throbbing and stabbing (A.R. 1253). She reported the brace helping "somewhat" (*id.*). On examination, Plaintiff experienced moderate pain in the right lumbosacral area and with back extension, some discomfort at the end range of rotation, no pain with flexion or side bending, and moderate discomfort on palpation over the right SI joints (*id.*). Plaintiff's SI stress test results were "[m]oderately positive" on the right only, she had a positive straight leg raise on the right, and she was positive for internal rotation on mechanical hip testing (A.R. 1253-54). While sensation and strength were normal, Plaintiff's gait and station were somewhat antalgic (A.R. 1253). Dr. Norris diagnosed right hip impingement syndrome and lumbar radicular pain and ordered an updated MRI (A.R. 1254). On February 8, 2017, Dr. Norris provided a brief handwritten note recommending that Plaintiff remain out of work through February 14, at which time he would review her new MRI results and re-evaluate her condition and ability to work (A.R. 1256).

At her February 14, 2017, follow-up appointment, Plaintiff reported feeling "somewhat better" and "getting stronger," with "a little less frequent and a little

less intense" pain, due to modifying her activities in accordance with Dr. Norris's advice (A.R. 1257). She reported her pain still ranged from a two to an eight on a scale of ten, but was no longer continuous; it still radiated into the groin and down her leg, was "aggravated by lifting, bending, sitting or standing for extended periods of time," and was eased "with walking, changing position and the use of muscle relaxers" (*id.*). Dr. Norris reviewed her new MRI and noted minimal changes from the 2015 MRI, including new disc bulges in three places (*id.*). On examination, Plaintiff had "severe pain . . . in the right lumbosacral area at the end range of lumbar extension," and "[s]evere discomfort on palpation over the right SI joints" (*id.*). Plaintiff's SI stress test results were once again "[m]arkedly positive" (*id.*). Plaintiff also had "[p]ain with side bending and flexion," "severe discomfort . . . with full rotation," and "marked tenderness to midline palpation at L5-S1 at the lumbosacral junction" (A.R. 1257-58). However, sensation was intact, manual muscle testing was full strength for both proximal and distal muscle groups, and range of motion was full for the lower extremities (A.R. 1258). Plaintiff's gait and station were moderately to severely antalgic (*id.*). Based on the "relatively benign MRI findings" combined with the results of the physical exam, Dr. Norris affirmed Plaintiff's pain likely stemmed from the SI joint, and Plaintiff agreed to proceed with SI injection therapy in addition to continuing bracing (*id.*).

That same day, Dr. Norris wrote another handwritten note indicating that Plaintiff could return to work on February 27, 2017, but for only ten hours per week, or two hours per day, increasing by one hour each week as tolerated, until re-

evaluation on April 25, 2017 (A.R. 1259). In a form requested in connection with management of Plaintiff's worker's compensation insurance, Dr. Norris opined that Plaintiff could only lift or carry up to ten pounds and checked the boxes indicating that Plaintiff had "[s]ome [r]estrictions" when pushing, pulling, walking, climbing, standing, stooping, bending, and sitting (A.R. 1260).

A March 17, 2017, physical therapy treatment note stated Plaintiff was walking daily and completing her therapeutic exercises every other day, and her "SIJ [SI joint] pain [was] more manageable," but "[s]tanding and sitting remain[ed] problematic" and Plaintiff needed to be careful to bend properly (A.R. 785).

On April 3, 2017, in response to another worker's compensation insurance management request, Dr. Norris increased his recommendation for Plaintiff's ability to work to ten to twelve hours of "light duty" work per week (A.R. 1261).

On April 4, 2017, Plaintiff reported to Dr. Norris that she was "still having quite severe sacroiliac pain," ranging from a three to an eight on a scale of ten, continuous, radiating, throbbing, and stabbing, aggravated by "sitting or standing still for more than 15 minutes, . . . lifting, pushing, or pulling," and eased by "walking, using the SI support belt, Advil, or muscle relaxers" (A.R. 1262). She reported that physical therapy helped in some ways, but "some of the exercises actually increased her pain" (A.R. 1262-63). Her physical examination results were materially unchanged from her February 14, 2017, visit, except that there was "[s]evere discomfort on palpation over both SI joints," not just the right (A.R. 1262). Dr. Norris again recommended SI injections "to try to speed up her recovery, but

she was still a little bit squeamish about the idea of back injections" (A.R. 1263). She stated "[s]he would like to finish up [physical therapy] and then if she is not improved will strongly consider proceeding to injections" (*id.*). She felt that she could only handle ten hours of work per week, "given how much pain she [was] in" (*id.*). Dr. Norris estimated he could reassess her ability to return to work in about month, to give her enough time to finish her physical therapy, get the injection, and let the injection reach its full effect (*id.*).

On April 14, 2017, Plaintiff reported that, with Dr. Norris's adjustments, physical therapy was going more smoothly and "she [was] making some improvement" (A.R. 1265). She reported continuous, moderate pain, "mostly localized to the bilateral sacral area," with occasional "pain into the buttock and posterior thigh[,] . . . exacerbated by too much activity" or "holding any one position for too long" (*id.*). She reported pain relief by changing positions, moving around or walking, occasionally taking muscle relaxers, and using a transcutaneous electrical nerve stimulation ("TENS") device (*id.*). Plaintiff stated "she [was] really looking forward to getting back to work," but both she and Dr. Norris were concerned about her working with large children, as she would be more vulnerable to injury than with smaller children (*id.*). She again agreed to bilateral SI injections (A.R. 1266). That same day, in the form again requested in connection with managing Plaintiff's worker's compensation insurance claim, Dr. Norris opined that Plaintiff could still perform "light duty" work, but could only lift, carry, push, or pull up to ten pounds;

had "[s]ome [r]estrictions" with walking, standing, and sitting; and should "avoid" climbing, stooping, and bending altogether (A.R. 1264).

Plaintiff still had not received the SI injections by her next appointment with Dr. Norris on May 12, 2017, at which she reported pain that was "somewhat better in the sense that it doesn't hurt all the time," but was still intermittently throbbing, stabbing, and radiating down her legs in the range of two to seven on a scale of ten, "aggravated by lifting, sitting for extended periods of time, bending at the waist and twisting," and improved by "walking, using the SI support belt, and avoiding activities that hurt it" (A.R. 1267). By this time, Plaintiff had "[m]oderate pain in both lumbosacral areas and with back extension," "some discomfort at end range of rotation," and "moderate discomfort on palpation over the bilateral SI joints" (*id.*). SI stress tests were "[m]oderately positive" bilaterally, and Plaintiff's gait and station were "somewhat antalgic" (*id.*). Dr. Norris discussed the SI injections further and planned to book Plaintiff in as soon as possible (A.R. 1268). According to Dr. Norris, he provided "her a work note to increase her work hours from 12/15 hours a week for a few days and then to 18 hours a week if she is tolerating it" (*id.*). Plaintiff received the SI injections on June 1, 2017 (A.R. 1269).

One week after the injections, on June 8, 2017, Plaintiff was seen by physical medicine and rehabilitation specialist Rebecca Lansky, D.O. Plaintiff reported that the "stabbing," "achy" pain from her work injury ranges in intensity from a two to a nine out of ten, "radiates across her back and down the right leg," and "seems to worsen at random times," in particular when sitting, leaning forward (especially

while driving), and lifting things (A.R. 1239). She reported that acupuncture helped the pain and the SI injections were not helping (*id.*). Dr. Lansky recommended "manual therapy to low back," and that the pain was "likely more of a problem with SI" (A.R. 1241).

At a follow-up appointment with Dr. Norris a few days later, on June 13, 2017, Plaintiff reported she was "significantly better": her pain had decreased to between a two and a six on a scale of ten, but still intermittently throbbed, was "aggravated by lifting [and] holding the same position for long periods of time," and would "awaken her during the night," but was improved by "changing position frequently, walking, and muscle relaxers" (A.R. 1271). "The pain no longer [went] into her groin but she continue[d] to hurt across the low back, especially on the right side" (*id.*). Plaintiff's examination results also improved: she had "[m]ild pain in the right SI area at the end of lumbar extension," "[s]ome discomfort at the end range of rotation," "[m]ild discomfort on palpation over the right sacroiliac joints," and "pain free" flexion and side bending (*id.*). Her SI stress test results were only "[m]ildly positive" on the right side, and she no longer had an antalgic gait or station (*id.*). Dr. Norris noted Plaintiff had "made quite a bit of progress," but Plaintiff reported "a lot of anxiety about returning back to" work due to the risk of re-injury by students (A.R. 1271-72). Dr. Norris suggested she consider "working with very young children, but she said that she thinks she is going to lean towards consulting for other therapists," either of which Dr. Norris opined "should help to keep her safe" (A.R. 1272).

### 2. *Treatment Notes from the Alleged Onset Date, June 30, 2017, to the Date Last Insured, December 30, 2018*

At a wellness visit with N.P. Normandin one month later, on July 13, 2017, Plaintiff again reported back pain, but there was no tenderness on palpation of her back (A.R. 777). Plaintiff stated that she was "not sure" if she could go back to school following her injury, citing a "[l]ot of stress at home with 2 adopted children with behavior issues" (*id.*). The next month, at a follow-up appointment for her GERD and anxiety with N.P. Normandin on August 29, 2017, Plaintiff reported that she "[q]uit her job—finally too much—taking time to regroup, seeing therapist," again citing stress at home, but also noting chronic back pain (A.R. 772).

The next day, on August 30, 2017, Plaintiff returned for her next scheduled follow-up with Dr. Norris, reporting that her SI pain had flared up following a month or two of improvement following the SI injections (A.R. 1273). While at her last appointment in June, she "was no longer having any groin pain but just localized back pain, especially on the right," her pain had returned to a range of three to seven on a scale of ten, "more continuous than intermittent, throbbing and stabbing[,] . . . radiat[ing] down the leg into the groin," still "aggravated by lifting, sitting or standing for extended periods of time, or being sedentary," and made "better with walking, muscle relaxers and the SI support belt which brings her a great deal of relief" (*id.*). Upon examination, Plaintiff had "some discomfort at end range of rotation," "[m]oderate pain in both lumbosacral areas and with back extension," "no pain with flexion or side bending," and "moderate discomfort on palpation over the bilateral SI joints" (*id.*). SI stress test results were once again

"[m]oderately positive," and Plaintiff's gait and station were "somewhat antalgic" (*id.*). They discussed the possibility of a minimally-invasive SI fusion surgery, in which Plaintiff was interested, and of repeating the SI injections, which she was "not quite ready to think about" (A.R. 1274).

One day later, on August 31, 2017, Plaintiff returned to Dr. Lansky for her continued chronic back pain (A.R. 1243). She reported "that the manual therapy was helpful for a couple of days," but "[s]he continue[d] to have severe back pain with referral down her leg" (*id.*).

At her next appointment with Dr. Lansky on September 19, 2017, Plaintiff rated her low back pain "at worst a 6 and is intermittent," but reported that it was severe enough to prevent her from completing her home exercises (A.R. 1244). She also reported occasional neck pain at seven out of ten and constant upper back pain (lateral to her scapulae) at a four out of ten (*id.*). She had a reduced range of motion in the lumbar spine with flexion, extension, side bending, and rotation; at the sacrum; and in the lower cervical spine with tight erector spinae muscles and tight sternocleidomastoid (A.R. 1245). She felt pain to light touch over her gluteal muscles, bilateral latissimus dorsi, and lumbar fascia, as well as to palpation at the occipitals (*id.*). Dr. Lansky performed cervical and lumbar spine osteopathic manual therapy procedures on Plaintiff (*id.*).

At another appointment with Dr. Lansky, the date of which is obscured, Plaintiff reported that her pain was "mostly the same," and "made it difficult [for her] to sit for long periods of time, and even driving for half an hour cause[d]

significant pain" (A.R. 1247). She reported that the pain was intense enough to "often cause[ ] her to stop what she's doing" (*id.*). Plaintiff indicated that she was "out of work due to her injury and [was] looking for new work" (*id.*). Dr. Lansky noted that Plaintiff "sits on edge of chair with completely straight back and looks unnatural and uncomfortable," and "has trigger point on lateral rib cage" (A.R. 1248).

On October 4, 2017, over a month after his last appointment with Plaintiff, Dr. Norris handwrote a new note stating: "Patient can not [sic] do any physical interventions or have any physical contact with students that pose a risk for back injury. Can not [sic] sit or stand for extended periods of time" (A.R. 1275).

Later that month, Plaintiff began a course of six weeks of twice-weekly physical therapy sessions for her back pain (A.R. 1412-14). She was noted to be "unable to tolerate sitting for 30 minutes," "unable to tolerate standing for 20 minutes," and "unable to sleep through the night" three to four nights per week (A.R. 1412). Her physical abilities and limitations (including lumbar spine flexion, extension, and movement, joint integrity, and lower extremity movement and strength) were measured at the outset of her treatment (A.R. 1412-13). The records from the remaining weeks were lost, however, by the physical therapy facility (A.R. 1416). The facility did confirm that Plaintiff was diagnosed with lower back pain and lower cross syndrome, and that her treatment "included soft tissue massage, deep tissue massage, therapeutic exercises, and a home exercise program" (*id.*).

On February 9, 2018, Plaintiff returned to Dr. Norris for the first time since August 30, 2017 (A.R. 561). At the time of the appointment, Plaintiff reported "the pain [was] about the same, ranging from 3-7 on a scale of 1-10" (*id.*). She described the pain as "intermittent, throbbing and stabbing," radiating "to the groin and down the leg," "aggravated by lifting, sitting or standing for too long, [and] bending over," and made "better with the SI support belt, walking, Advil and Tylenol" (*id.*). The results of Plaintiff's physical examination were largely the same, except that she had "some pain with flexion and side bending," "[m]arkedly positive SI stress tests bilaterally," "[m]oderate pain on palpation over both iliolumbar ligaments," and "moderately antalgic" gait and station (A.R. 561-62). Dr. Norris assessed that Plaintiff's SI pain was stable, and again discussed the SI fusion surgery, as well as radiofrequency ablation, another long-term option, which she stated "she would strongly consider" (A.R. 562). There are no other notes showing Plaintiff sought further treatment specifically for her back pain for the remainder of the insured period, through December 31, 2018.

On November 9, 2018, however, following an incidental finding of osteitis pubis, N.P. Normandin referred Plaintiff to Carolyn Bentley, P.T., for pelvic floor therapy (A.R. 764). At the initial physical therapy evaluation, Plaintiff reported a "long history of anterior pelvic pain" connected to her back injuries at work, always present but worsened by "prolonged sitting and repetitive bending" (A.R. 553). Plaintiff noted that she was seeing Dr. Norris, using a brace, and attending physical therapy for the SI problem; she was not currently doing her exercises, but was

walking "several miles a day" (*id.*). P.T. Bentley recommended physical therapeutic activities (A.R. 554).

N.P. Normandin also referred Plaintiff to pelvic pain specialist James G. Gebhardt, M.D., prior to her date last insured (*see* December 18, 2018, gynecology office intake note at A.R. 1284-88). At that time, she reported intermittent pain "in lower back to right groin and pelvis," ranging from "stabbing" pain at its worst to "achy" at its best (A.R. 1284). She rated her pain at between three and eight on a scale of ten (*id.*).

At her first appointment with Dr. Gebhardt on January 29, 2019, shortly after her date last insured, Plaintiff stated that she did not have any pelvic pain problems prior to her back injuries at work a few years prior (A.R. 1289). She reported that her pain, which fluctuated "but [was] always present," was at a four out of ten (*id.*). She noted that "[t]he pain in the back and in the front sometimes go together however other times she gets the front pain without any back pain" (*id.*). Dr. Gebhardt examined Plaintiff's abdomen, noting: "[n]otable for trigger point at the lateral edge of the rectus sheath in . . . [both lower quadrants], with a positive twitch and grimace response"; pain increasing from a four to a seven out of ten with light palpation; a positive Carnett's test; and pain worsening to an eight out of ten with tensing of the abdominal wall musculature (A.R. 1291). Dr. Gebhardt diagnosed Plaintiff with abdominal myofascial pain syndrome and subsequently treated her with trigger point injections (*id.*). Plaintiff presented for follow-up injections on February 12, 2019 (A.R. 1293), March 5, 2019 (A.R. 1295), April 2,

2019 (A.R. 1299), April 23, 2019 (A.R. 1303), May 21, 2019 (A.R. 1304), June 25, 2019 (A.R. 1306), August 13, 2019 (A.R. 1308-09), September 10, 2019 (A.R. 1310), and September 19, 2019 (A.R. 1313-14).

At the March 5, 2019, visit, Plaintiff stated "that the pain feels about the same as it initially did but it really depends on what [she] do[es]" (A.R. 1293). Before the injections, "[p]hysical therapy was not helpful because [she] was in too much pain to do [the exercises]," but she was able to do them with the injections (*id.*). Later that month at physical therapy, Plaintiff reported that the physical therapy coupled with the trigger point injections had improved her pain by about twenty percent, particularly in her low back (A.R. 548). And at the May 21, 2019, visit with Dr. Gebhardt, Plaintiff reported "significant improvement with the injections" and that she was "currently unemployed and thinking about switching career [sic]" (A.R. 1304).

B. State Agency Consultants

On initial review of Plaintiff's application for disability benefits, orthopedic specialist Jeff Zhang, M.D., reviewed Plaintiff's medical records and completed two disability determinations on September 29, 2023, for the Plaintiff's separate applications: the first for disability benefits for the period from the alleged onset date of June 30, 2017, through the date last insured, December 31, 2018 (A.R. 93-98), and the second for SSI from the application date of September 19, 2022, through the date of the determination (A.R. 99-107). He found that there was "Medical Evidence in File But Insufficient to Establish Diagnosis" prior to

December 31, 2018 (A.R. 93), so he could not complete a residual functional capacity ("RFC") assessment for that period. Notably, Dr. Zhang appears not to have had the records from Dr. Norris, which were not added to Plaintiff's file until September 26, 2024 (A.R. 95, 1249).

In evaluating the period from September 19, 2022, Dr. Zhang assessed some exertional and postural limitations: Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; engage in unlimited pushing and pulling with her upper and lower extremities; stand and walk five hours in an eight-hour day; sit six hours in an eight-hour day; frequently kneel, crouch, and climb ramps and stairs; and occasionally stoop, crawl, and climb ladders, ropes, and scaffolding (A.R. 104-05). Dr. Zhang found that Plaintiff did not have any manipulative, visual, or communicative limitations, but should avoid concentrated exposure to vibration and hazards such as machinery and heights (*id.*).

On reevaluation, internal medicine specialist Elaine Hom, M.D., reviewed Plaintiff's medical records and on December 19, 2023, similarly completed separate disability determinations for the two discrete periods (A.R. 108-23). Like Dr. Zhang, Dr. Hom concluded that there was insufficient evidence of Plaintiff's claimed impairments prior to December 31, 2018, to be able to assess the severity of Plaintiff's physical impairments for that period (A.R. 118-23). Dr. Hom likewise appears not to have had Dr. Norris's records (A.R. 119).

For the period from September 19, 2022, to the date of the determination, Dr. Hom assessed that Plaintiff could occasionally lift and carry twenty pounds and

frequently lift and carry ten pounds; engage in unlimited pushing and pulling with her upper and lower extremities; stand and walk six hours in an eight-hour day; sit six hours in an eight-hour day; balance frequently; and occasionally climb, stoop, kneel, crouch, and crawl (A.R. 114). Dr. Hom found that Plaintiff was limited to occasional reaching overhead bilaterally and should avoid concentrated exposure to vibration and hazards such as machinery and heights, but had no other manipulative, visual, communicative, or environmental limitations (A.R. 115).

C. Function Reports and Statements

Both Plaintiff and her partner completed SSA function reports detailing Plaintiff's limitations. In a report dated March 2, 2023, Plaintiff stated that she "had been struggling with pain for over five years . . . [which she] thought . . . was back pain due to work injuries," but was later diagnosed as fibromyalgia and thoracic outlet syndrome (A.R. 338). She stated she was "unable to do much due to the ongoing back pain, nerve pain, and corresponding limitations," could not "lift more than 2 lbs., need[ed] to change positions regularly," and because she could not "do much physically," she was limited in her "ability to work in any capacity" (*id.*). She reported managing some daily activities, childcare, and pet care, but most of the daily living responsibilities, like cooking and cleaning, were handled by her partner (A.R. 339-40). Her back, neck, and nerve pain made it difficult for her to drive or walk long distances (A.R. 341-43).

On November 12, 2022, her partner completed a third-party function report, affirming Plaintiff's report: "she is constantly in pain and lacks strength and

endurance to do any activity for long" (A.R. 363). Her partner reported doing "the laundry, cooking, cleaning, grocery shopping, driving, and errands," and detailed several daily activities which Plaintiff used to perform but could no longer (A.R. 364-69).

In another report completed on November 14, 2023, Plaintiff stated that she was "not able to use [her] upper body to do most activities due to nerve pain," and her "on-going back pain, neck pain and headaches . . . impact [her] ability to function" (A.R. 373). She again detailed that she was unable to complete many daily activities and relies on her partner and children (A.R. 374-78). She noted that her nerve pain and ability to function had worsened since her most recent surgery (A.R. 380).

In a later statement from October 1, 2024, Plaintiff's partner detailed Plaintiff's history of back injury, subsequent physical limitations, attempts at medication management and physical therapy, eventual diagnosis of thoracic outlet syndrome, surgeries, and ongoing daily living limitations (A.R. 420-23).

D. Administrative Hearing

1. *Plaintiff's Testimony*

At the February 21, 2025, hearing, Plaintiff testified about her claimed impairments and work history (A.R. 55-70). Plaintiff testified that, in the years prior to her alleged onset date, she had worked as a school behavior analyst, a role in which she "responded to crisis situations, which required physical interventions" to restrain students with behavioral issues (caused by, e.g., "autism, mental health

issues, trauma" (A.R. 62)), sometimes using force up to fifty pounds (A.R. 56; *see* A.R. 306). She reported that she stopped working in the wake of the December 2016 incident, when a student pulled her to the ground and injured her back and neck (A.R. 60). She testified that she began seeing Dr. Norris shortly thereafter, and that he diagnosed her with "SI joint issues, sacroiliac, sciatica, hip impingement, [and] bulging discs" (*id.*). He prescribed her muscle relaxers and anti-inflammatory medications, which made her "really tired and dizzy, but [she] needed them in order to function" (*id.*).

Plaintiff explained how she returned to work after the December 2016 incident on a limited basis in February 2017, for about two hours per day (A.R. 60-61). She testified that she "wasn't able to do much at work during that time between February 2017 and [the alleged onset date of] June of 2017" (A.R. 62). The medication she was on made it "really hard to concentrate," she was "exhausted all the time, and [she] was still in pain" (*id.*). Due to the intense pain extending "from [her] lower back into [her] groin into [her] pelvic region," Plaintiff could not bend over, lift anything, or climb stairs, she had "a very difficult time walking," struggled to sit for more than ten to fifteen minutes, and even had to sleep in a recliner (A.R. 62-63, 70). She struggled to travel between schools, as required by her job, due to her neck and back pain while driving (A.R. 62). She was unable to intervene if a child with behavioral issues "became aggressive or disruptive to the point that they would need to be removed or restrained" (*id.*). She never worked more than ten

hours per week consistently upon her return in February 2017, and she stopped working altogether at the end of the school year in June 2017 (A.R. 62, 69).

Plaintiff testified that Dr. Norris gave her an injection in her SI joints, which "helped a little bit for . . . maybe a month," but still her symptoms were "getting worse and worse" (A.R. 62-63). Plaintiff subsequently visited Dr. Lansky to reportedly obtain a more holistic view of her condition, who saw "this as a bigger problem than just lower back pain" because Plaintiff also had neck pain and hand numbness when lifting her hands over her head (*id.*). Dr. Lansky moved her medical practice or retired shortly thereafter, so Plaintiff returned to Dr. Norris, who "gave [her] this SI belt that [she] wore all the time to try to keep everything aligned," and started attending physical therapy with several physical therapists (A.R. 63-64, 67). She reported that physical therapy only made her symptoms worse (A.R. 65). Plaintiff also mentioned the trigger point injections she received from Dr. Gebhardt to "numb the area," which helped with the pain but "would wear off very quickly," and she "still couldn't do much" (A.R. 64).

For the period insured for disability benefits, from June 2017 to the end of 2018, Plaintiff stated that she would not have been able to stand and walk for a total of six hours in an eight-hour day (A.R. 64). During that period, she had to shift positions approximately every ten minutes, alternating between sitting, lying down, and walking, because "any time that [she] had to stay stationary, it was pretty painful" (A.R. 64-65). Her hands went numb anytime she raised them over her head, her fingers became tingly when typing or writing, and she "couldn't carry

much of anything" and "was always dropping things" (A.R. 65-66, 70). At that time, she managed some small daily tasks, such as making appointments for her kids, driving very short distances, and doing some cooking, but her partner handled most of the household responsibilities (A.R. 65-66).

Since that time, Plaintiff reported that her symptoms had not improved (A.R. 66). She reported that she was eventually diagnosed with thoracic outlet syndrome in 2022, which explained her prior symptoms (*id.*). She had two surgeries to try and correct her condition, but the nerve damage was irreversible (A.R. 66-67). She stated that her nerves had been "compressed through most of [her] life," but her surgeon represented that the constant use of those muscles at her job "made it all worse" (*id.*). At the time of the hearing, Plaintiff was still taking daily medication to manage the nerve pain (A.R. 67).

2. *Vocational Expert's Testimony*

The ALJ first asked Kathleen Doehla, the vocational expert, to classify Plaintiff's past work by skill and exertional level (A.R. 71). Based on the testimony and other evidence provided by Plaintiff, Ms. Doehla testified that Plaintiff's work as a school behavior analyst did not translate directly to a single Dictionary of Occupational Titles ("DOT") occupation, but rather a composite job of behavior health counselor (DOT 195.227-010), with a DOT specific vocational preparation of 6, which is considered "skilled work," generally requiring a light exertional level, but requiring a medium exertional level as actually performed, and a resident care aide (DOT 355.377-018), also with a DOT specific vocational preparation of 6,

requiring a medium exertional level both generally and as actually performed (A.R. 72).

The ALJ next asked Ms. Doehla to consider a hypothetical individual of Plaintiff's age, education, and work experience, who is capable of performing light work, except she could only stoop, kneel, crouch, and climb ramps and stairs occasionally; never balance, crawl, or climb ladders, ropes, or scaffolds; frequently reach in all directions, but only occasionally overhead; have occasional exposure to vibration and extreme cold temperatures; and have no exposure to hazards such as moving mechanical parts and high exposed places (A.R. 72-73). Ms. Doehla opined that such a person would not be able to perform Plaintiff's past work as it was actually performed (A.R. 73). She opined, however, that such an individual could perform work as a furniture rental clerk (DOT 295.357-018), with a DOT specific vocational preparation rating of 2, which is considered "unskilled work," and a light exertional level, for which there are an estimated 60,500 positions in the national economy; a cashier (DOT 211.462-010), also with a DOT specific vocational preparation of 2 and a light exertional level, for which there are an estimated 580,800 positions in the national economy; and a mail clerk (DOT 209.687-026), also with a DOT specific vocational preparation of 2 and a light exertional level, for which there are an estimated 13,500 positions in the national economy (A.R. 73).

The ALJ next asked Ms. Doehla to consider that same hypothetical individual, except with the added limitation that she could only stand or walk four hours in an eight-hour day (A.R. 74). Ms. Doehla testified that, with that additional

limitation, the individual could still perform work as a furniture rental clerk (DOT 295.357-018) and mail clerk (DOT 209.687-026), but would be precluded from working as a cashier (DOT 211.462-010) (*id.*). She testified that such an individual could instead perform work as routing clerk (DOT 222.687-022), also with a DOT specific vocational preparation of 2 and a light exertional level, for which there are an estimated 92,200 positions in the national economy (*id.*).

Finally, the ALJ asked Ms. Doehla to consider the hypothetical individual, except further limited to sedentary work (A.R. 75). She opined that there would not be any skills transferable from Plaintiff's composite job to any sedentary occupations (*id.*).

Plaintiff's hearing counsel asked Ms. Doehla to consider the original hypothetical individual, with the added limitations of being off-task ten percent of the day, missing work without excuse once per month, or only being able to sit and stand two hours in an eight-hour day (A.R. 90). She opined that any of these limitations would eliminate the jobs she had offered (*id.*). She further testified that none of the positions she provided "have a place for somebody to lie down when they need to in the workplace" (*id.*).

## II. THE ALJ'S DECISION

On March 10, 2025, the ALJ issued a decision granting in part and denying in part Plaintiff's claims (A.R. 17-34). The ALJ conducted the requisite five-step sequential analysis set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(i)-(v); 20 C.F.R. §

416.920(a)(4)(i)-(v). At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 30, 2017, through both her date last insured for disability benefits, December 31, 2018, and her date last insured for Medicare, December 31, 2022 (A.R. 20). At the second step, he found that Plaintiff's severe impairments included obesity; fibromyalgia; cervical, thoracic, and lumbar degeneration with stenosis; occipital neuralgia; and thoracic outlet syndrome (established March 7, 2022) (*id.*). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (A.R. 23).

Before considering step four, the ALJ found that, for the period from June 30, 2017, through March 6, 2022, Plaintiff had the RFC to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) (A.R. 23-29). In so doing, he discounted the opinions of both Dr. Zhang and Dr. Hom, finding their assessments "regarding insufficient evidence prior to the date last insured not persuasive, as there is enough evidence prior to the date last insured to find severity and to support a full range of light exertional work" (A.R. 29). The ALJ assessed a more restrictive RFC from March 7, 2022, onward: he found that Plaintiff could perform light work, except she could only stand or walk for four hours in an eight-hour workday; occasionally stoop, kneel, crouch, and climb ramps and stairs; never balance, crawl, or climb ladders, ropes, or scaffolds; frequently reach in all directions, but only occasionally overhead; have occasional exposure to

vibration and extreme cold temperatures; and have no exposure to hazards such as moving mechanical parts and high exposed places (A.R. 29-32).

At step four, the ALJ determined that, since the alleged onset date of June 30, 2017, Plaintiff had been unable to perform any past relevant work in the composite role of behavioral health counselor (DOT 195.227-010) and resident care aide (DOT 355.377-018), which required the performance of medium-exertional work-related activities precluded by Plaintiff's RFC (A.R. 32).

Finally, at step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found that, prior to July 4, 2020, Plaintiff could perform jobs found in significant numbers in the national economy and, therefore, Plaintiff was not disabled prior to that date (*id.*). However, upon Plaintiff's age category changing to an individual of advanced age on July 4, 2020, the ALJ found that there were no longer jobs that exist in significant numbers in the national economy that Plaintiff could perform (A.R. 33). Plaintiff thus became disabled on that date and continued to be disabled through the date of the decision (*id.*). Therefore, the ALJ found that Plaintiff was not disabled for purposes of disability benefits at any time, because she was only insured for disability benefits through 2018, and she was only disabled for purposes of Medicare from July 4, 2020, through December 31, 2022, when she was last insured for Medicare coverage (*id.*).

Plaintiff objects specifically to the ALJ's disability benefits finding, arguing that the ALJ should have found her disabled for the entire insured period, from the

alleged onset date of June 30, 2017, to the expiration of her insured status on December 31, 2018.

## III. STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)). The court reviews questions of law *de novo*, *id.*, but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence,

and draw conclusions from such evidence. *See Applebee*, 744 F. App'x at 6. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## IV. ANALYSIS

Plaintiff presents several somewhat interrelated claims of error: she contends that the ALJ's decision is not supported by substantial evidence because his analysis was conclusory, he misinterpreted the evidence of record by discrediting some of Dr. Norris's opinion evidence and Plaintiff's subjective reports of symptoms, and he impermissibly interpreted raw medical data in assessing Plaintiff's RFC. The court addresses each of Plaintiff's arguments in turn.

### A. The ALJ Adequately Explained His Findings

Plaintiff first complains that, in his decision, the ALJ summarized the record and concluded that Plaintiff is limited to light work without "actually explaining the connection between this evidence and his finding . . . " (Dkt. No. 12, at 13). The Commissioner, for his part, argues that the ALJ did, in fact, articulate "how the evidence (both medical and nonmedical) supported the RFC finding" (Dkt. No. 16, at 13).

Plaintiff cites to case law standing for the propositions that "the ALJ must connect his RFC finding by 'an accurate and logical bridge' to the evidence," (Dkt. No. 12, at 13) (citing *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 280 (2024)), and that a "statement of a mere conclusion, even if accompanied by a summary of the

evidence, is not analysis that permits meaningful judicial review of the ALJ's decision" (*id*., at 13-14 (multiple emphases removed) (citing *Murphy v. Acting Comm'r,* No. 23-cv-281-PB-AJ, 2023 WL 9188011, at *8 (D.N.H. Dec. 26, 2023); *Gloria K. v. O'Malley*, 714 F. Supp. 3d 41, 44 (D.R.I. 2024); *Sparks v. Kijakazi*, No. 2:21-CV-102-DCP, 2022 WL 4546346, at *7 (E.D. Tenn. Sept. 28, 2022)).

But here, the court finds that it "can follow [the ALJ's] logic." *Sparks*, 2022 WL 4546346, at *7. The ALJ thoroughly summarized the portions of the record on which he relied in finding Plaintiff limited to light work, including the administrative hearing, function reports, and medical records (A.R. 23-28). He expressly noted which portions of the record he did not find persuasive, and why (*id.*). He explained his finding of Plaintiff's limitations as follows:

> Considering the consistently full grip strength and lack of neurological deficits [observed upon examination on December 23, 2019], the undersigned finds the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, consistent with light exertional work. While the claimant exhibited diffuse tenderness, she had no radiculopathy and no use of assistive device for ambulation. The undersigned finds the evidence support [sic] a standing and/or walking capacity consistent with light exertional work, namely, standing and/or walking for 6 hours per 8-hour day (A.R. 27-28).

He further explained his finding of a light RFC:

> As outlined above, the claimant generally responded well to injections for back/SI pain, as well as physical therapy for neck pain. She exhibited no neurological deficits and required no assistive device for ambulation. Considering the totality of the evidence, the undersigned finds the claimant retained the capacity for light exertional work. The undersigned notes that, while the claimant has documented BMI's above 30, there is no indication that

> obesity precludes a full range of light exertion (SSR 19-2p), as the claimant has responded well to conservative treatment for back and neck pain (A.R. 28).

Whether the ALJ's full range of light work RFC is otherwise supported by substantial evidence presents another question, to which the court will turn next. However, the court finds that the ALJ's decision was not conclusory, and the matter should not be remanded on the ground of inadequate explanation.

B. <u>The ALJ Properly Evaluated the Opinion Evidence</u>

Plaintiff argues that the ALJ ignored or minimized medical evidence demonstrating the severity of Plaintiff's limitations (namely, Dr. Norris's opinions). The Commissioner, for his part, argues that the ALJ explicitly discussed the same treatment note which Plaintiff contends he barely acknowledged. The court finds that remand is not warranted on this ground, either, as the ALJ adequately explained his rationale for finding certain evidence not persuasive.

The ALJ found Dr. Norris's February 14, 2017, and April 14, 2017, work notes—noting, inter alia, "some restriction" in pushing, pulling, walking, climbing, standing, stooping, bending, and sitting—were "not persuasive, as they were offered prior to the alleged onset date" and "the term 'some restriction' is not defined in terms of a capacity in an 8-hour workday" (A.R. 26). The ALJ also found Dr. Norris's October 4, 2017, note—that Plaintiff could "not do any physical interventions or have any physical contact with students that pose a risk for back injury" or "sit or stand for extended periods of time"—was "not persuasive, as Dr. Norris does not

define 'extended periods of time,' nor does he cite to objective findings to support the assessed limits" (*id.*).

Plaintiff contends, in short, that the ALJ should not have discounted Dr. Norris's opinion evidence on Plaintiff's limitations, because there was ample evidence in the record to support these limitations, even if Dr. Norris did not explicitly cite to such evidence within the note itself. The Commissioner argues that "[t]he ALJ properly rejected [the October 4, 2017, note] because 'extended periods' was not defined, and Dr. Norris did not identify any objective findings to support his opinion" (Dkt. No. 16, at 15).

In determining a claimant's RFC, an ALJ "must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Harrison v. Saul*, Civil No. 20-10295-LTS, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021) (quoting SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996)). In making this determination, "the ALJ must consider the following factors: supportability, consistency, relationship, specialization, and other factors," the most important of which are supportability and consistency. *Id. (*citing 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5); *Nicole C. v. Saul*, C.A. No. 19-127 JJM, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020)). "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation, and consistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the

record." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023) (citing 20 C.F.R. § 404.1520c(c)(1)-(2)).

Here, the ALJ expressly noted why he did not find Dr. Norris's opinions from February 14, 2017, April 14, 2017, and October 4, 2017, persuasive: the first two opinions were written prior to the alleged onset date, the final opinion did not "cite to objective findings" (which goes to its supportability), and the terms "some restriction" and "extended periods of time" were not defined (which leads to issues in determining whether these opinions are consistent with the record) (A.R. 26). While Plaintiff may not agree with the ALJ's weighing of the evidence, it is not this court's place to rehash his resolution of conflicts in the evidence or reassess issues of credibility, in the absence of error. *See Applebee*, 744 F. App'x at 6. Thus, remand based on this argument is not warranted.

C. <u>The ALJ Impermissibly Interpreted Raw Medical Data in Assessing Plaintiff's RFC</u>

Plaintiff's strongest argument is that the ALJ impermissibly interpreted raw medical data to construct his own RFC. The Commissioner, for his part, argues that the ALJ only relied on raw medical evidence to the extent that he was permitted to do so, as a lay person. The court agrees with Plaintiff that the ALJ's reliance on raw medical data to reach his conclusion was impermissible, and remand is thus warranted on this ground.

As discussed, the ALJ found that Plaintiff had the RFC to perform a full range of light work for the entire period insured for disability benefits (A.R. 23). He found the opinions of Dr. Zhang and Dr. Hom, that there was not enough evidence

in the record to assess an RFC for that period, not persuasive, finding instead that "there is enough evidence prior to the date last insured to find severity and to support a full range of light exertional work" (A.R. 28-29). The ALJ did not acknowledge that Drs. Zhang and Hom did not have Dr. Norris's records to review when they drew their conclusions. In assessing his own RFC finding Plaintiff capable of the full range of light work, the ALJ seemingly relied heavily on a single December 23, 2019, treatment note reflecting that Plaintiff had full grip strength, no neurological deficits, and no radiculopathy, and did not need an assistive device for ambulation (A.R. 28).

In general, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (citing *Perez v. Sec'y of Health & Hum. Servs.*, 958 F.2d 445, 446 (1st Cir. 1991); *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir.1990)). While, as the Commissioner argues, "an ALJ is not precluded from rendering common sense judgments about functional capacity based on raw medical evidence, as long as the ALJ does not overstep the bounds of a lay person's competence," the court is not convinced that this exception applies here. *Maniscalco v. Colvin*, 167 F. Supp. 3d 207, 217 (D. Mass. 2016) (citing *Gordils*, 921 F.2d at 329; *Beyene v. Astrue*, 739 F. Supp. 2d 77, 83 (D. Mass. 2010)). "[W]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Manso-Pizarro*, 76 F.3d at 17 (citing *Perez*, 958 F.2d at 446; *Gordils*,

921 F.2d at 329). But here, the record is replete with evidence that "indicate[s] the existence of medical conditions and symptomatology that do not appear, at least without further evaluation by an expert, to be so mild as to make it obvious to a layperson that the claimant's ability to perform . . . work [functions] . . . was unaffected." *Manso-Pizarro*, 76 F.3d at 18-19. This conclusion is buttressed by the fact that the state agency examiners (who are qualified to interpret raw data in medical records) did not have the records that are likely most relevant to assessing the severity of Plaintiff's physical impairments between her alleged onset date and date last insured—Dr. Norris's records—when they concluded that the records they had were insufficient. And Dr. Norris's records are replete with raw data, including observed pain responses, positive SI and other test results, and impaired gait and station findings, that a lay person is not qualified to interpret or translate into functional limitations. The ALJ thus impermissibly relied on his own interpretation of raw medical data in assessing Plaintiff's RFC, and remand is warranted on this count.

D. <u>The Court Does Not Opine on the Adequacy of the ALJ's Assessment of Plaintiff's Subjective Complaints</u>

Finally, the court notes that Plaintiff also raised the argument that "an ALJ's failure to correctly evaluate opinion evidence, and/or the record generally, directly undermines any finding he makes regarding the so-called 'credibility' of the claimant's description of their symptoms and limitations" (Dkt. No. 12, at 7). Plaintiff argues, without naming specific examples, that the ALJ's analysis of her symptoms was "doomed from the beginning" because of the other errors he

purportedly made (*id.*, at 16). The Commissioner urges the court to dismiss this argument based on lack of development (Dkt. No. 16, at 20 n.5) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders . . . a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal quotation marks omitted)). Because this case warrants remand for the reasons cited above, the court does not rule on the merits of this final argument.

## V. CONCLUSION

For the foregoing reasons, the court DENIES the Commissioner's motion to affirm (Dkt. No. 15), GRANTS Plaintiff's motion to reverse (Dkt. No. 11), vacates the ALJ's decision, and remands the matter for further administrative proceedings consistent with this opinion.

Date: September 30, 2026

/s/ Christopher L. Morgan
CHRISTOPHER L. MORGAN
U.S. MAGISTRATE JUDGE